OPINION
This is an appeal from a judgment of the Probate Court in favor of a plaintiff in an action contesting a will. The judgment was entered on the verdict of a jury. On appeal, Defendants argue that the judgment was against the manifest weight of the evidence. After reviewing the entire record, we agree, and accordingly will reverse the Probate Court's judgment and remand for a new trial.
On March 9, 1995, Ralph Worstell executed a written will. It directed his executor, after the payment of his debts and funeral expenses, to convey Ralph's car and a life interest in his house to his friend, Bonnie Phillips, and the remainder interest in his house and the residue of his estate to his nephew and only surviving relative, Gary Martin Worstell.
In late 1999, at ninety-one years of age, Ralph was diagnosed with cancer and began treatment at a local hospital. Eventually, Ralph's physical condition worsened and caused him to be transferred to a nursing home.
On March 16, 2000, Ralph executed a new last will and testament, which revoked his 1995 will. This will directed his executor after paying all debts and funeral expenses, to convey a life interest in his house and his car to Bonnie Phillips, the remainder interest in his house and $100,000 to Gary Martin Worstell, $12,000 to a friend, Harold Todd, and the residue of his estate to the American Cancer Society. This will was prepared by Attorney B. Eugene Gilbert. Ralph Worstell contacted Gilbert after several unreturned phone calls were made to the attorney who had prepared Ralph Worstell's three previous wills.
Ralph Worstell died on May 4, 2000. At his death, Ralph owned a house valued at approximately $90,000, two farms valued at approximately $245,600 and $199,400, respectively, an automobile, and bank accounts containing approximately $185,000. Under the terms of his March 16, 2000 will, Gary Worstell would receive assets in the approximate amount of $190,000 and the American Cancer Society would receive assets of the approximate value of $345,000. Under Ralph Worstell's 1995 will, those assets were bequeathed to Gary Worstell.
Ralph Worstell's 2000 Will was admitted to probate on May 17, 2000. Gary Worstell, his nephew, contested the will. A trial was held and the jury rendered its verdict, by a vote of six jurors, in favor of Gary Worstell, finding that the 2000 Will is not the last will and testament of Ralph Worstell.
The American Cancer Society filed a timely notice of appeal. Two assignments of error are presented:
FIRST ASSIGNMENT OF ERROR
 "THE TRIAL COURT ERRED IN OVERRULING DEFENDANT-APPELLANT'S MOTION FOR A JUDGMENT NOT WITHSTANDING THE VERDICT BASED ON PLAINTIFF-APPELLEE'S FAILURE TO SATISFY HIS BURDEN OF PROOF."
 Civ.R. 7(B)(1) provides that "[a]n application to the court for anorder shall be by motion which, unless made during a hearing or trial,shall be made in writing." A trial is a hearing on the merits whichconcludes with the return of a verdict on the claims for relief involvedor, if prior to the submission of those claims to the trier of fact, withan order or judgment of the trial court directing a judgment on the claimfor one of the parties. The rule further provides that "[a] motion,whether written or oral, shall state with particularity the groundstherefor, and shall set forth the relief or order sought."
 Civ.R. 50(B) provides that a motion for judgment notwithstanding theverdict "may be made not later than fourteen days after entry ofjudgment" on the verdict. The motion may precede the judgment. Rumley v.Cerco, Inc. (Sept. 20, 2001), Franklin App. No. 00AP-1228. The motionmust, nevertheless, be one made in writing, per Civ.R. 7(B)(1) because, averdict having been returned on which the judgment was entered, themotion is not one "made during a hearing or trial."
 The motion that Defendants made was oral and preceded the judgment, andwas made immediately after the verdict was returned and accepted by thecourt. The motion was stated in perfunctory terms: "Like to move for ajudgment notwithstanding the verdict, Your Honor." The court replied:"All right. Overruled. That's it." (T. 451-452).
 The form in which the motion was made lacked any explanation for itsgrounds. A written motion and memorandum in support could have providedthat. As the motion was not made in accordance with Civ.R. 7(B)(1), inwriting, we cannot find that the trial court abused its discretion whenit denied the motion as it did. The first assignment of error isoverruled.
 SECOND ASSIGNMENT OF ERROR
 "THE JURY'S VERDICT INVALIDATING MR. WORSTELL'S 2000 WILL SHOULD BE REVERSED AS IT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 Appellants argue that the jury's verdict is contrary to the manifestweight of the evidence and should be reversed because there is inadequateevidence in the record to show that Ralph Worstell lacked testamentarycapacity when he executed the 2000 Will. In reviewing a claim that theverdict is against the manifest weight of the evidence, an appellatecourt must review the entire record to determine whether the judgment issupported by some competent, credible evidence going to all the essentialelements of the case. C.E. Morris Co. v. Foley Constr. Co. (1978),54 Ohio St.2d 279, 8 O.O.3d 261.
 It is undisputed that the will which Ralph executed on March 16, 2000,and which was admitted to probate on May 17, 2000, was signed by him andis otherwise proper in form. Plaintiff, Gary Worstell, attacked the willon two grounds. He alleged that it was the product of undue influence, aclaim he eventually abandoned. He also alleged that Ralph M. Worstell wasnot competent to make that will. The jury found in favor of Gary Worstellon that claim, six in favor and two abstaining.
 R.C. 2107.02 provides that "[a] person of the age of eighteen years, orover, sound mind and memory, and not under restraint may make a will." Aperson is presumed to be of sound mind. Kennedy v. Walcutt (1928),118 Ohio St. 442. In order to successfully challenge the validity of awill admitted to probate, the initial burden is on the contesting partyto prove the will invalid. Kirschbaum v. Dillon (1991), 58 Ohio St.3d 58.
 A testator has capacity to make a will when he has sufficient mind andmemory (1) to understand the nature of the business in which he isengaged, (2) to comprehend generally the nature and extent of hisproperty, (3) to hold in his mind the names and identities of those whohad natural claims upon his bounty, and (4) to be able to appreciate hisrelation to members of his family. Niemes v. Niemes (1917),97 Ohio St. 145. A person who lacks testamentary capacity is notcompetent to make a will. Neither is that person competent to revoke aprior will made when the person was competent, because the same degree ofmental capacity necessary to make a will is required to revoke one. See79 American Jurisprudence 2d, Wills, Section 500.
 Gary Worstell presented three witnesses in contesting the 2000 will;himself, Robert Bentley, who rented one of Ralph M. Worstell'sproperties, and Dr. Albert N. Bayer, a psychiatrist specializing ingeriatric diagnosis and treatment.
 Gary Worstell testified that he has lived in Georgia since 1965. Headmitted he did not often see his uncle, Ralph Worstell, after he movedfrom Ohio. Since 1990, Gary visited his uncle only three times; twice in1991 and on the day before Ralph died in 2000. (T. 55). Gary testifiedthat he typically talked to Ralph by telephone two to three times amonth. (T. 56).
 Although his contact with his uncle was minimal, Gary testified thathis uncle seemed confused on several occasions. While Gary did notmention this during his deposition, at trial he testified that in themonths following January 2000, Ralph would interrupt their conversationsand "jump into the way past about something that happened several yearsago." (T. 64-65).
 While Gary never expressly stated it, his testimony supports aninference that Ralph was not of sound mind in the months before and afterthe 2000 Will was executed. However, contrary to Gary's testimony abouthis uncle's diminishing mental capacity, much of his testimony shows thatRalph was lucid and that he understood what was going on around him.
 Gary testified that during a conversation in January of 2000, twomonths before Ralph executed the 2000 will, he discussed Ralph's estatewith him. Specifically, Gary testified that they discussed "where [Ralph]kept his papers, where he kept his will, . . . who lived in the houses,what banks his money was in. Everything. He basically listed what he hadand what he wanted to do. He told me he wanted to give the money toHarold. Told me what he left Bonnie. Told me he left me the executor andthe rest of it." (T. 62). Gary testified that during this conversationRalph described specific farming equipment he owned and told him wherethat equipment was located. (T. 86). According to Gary, Ralph sounded andacted normal during the conversation. (T. 63). This conversation showsthat Ralph had a solid understanding of his property.
 In late February or early March of 2000, Ralph and Gary discussed thepossibility of Ralph selling his farms because Ralph was worried aboutpaying his mounting medical expenses. (T. 66). Although Gary talked Ralphinto holding off on the idea, the conversation shows Ralph wassufficiently competent to understand and be concerned about his financialaffairs.
 Though the record is not entirely clear, in January 2000, March 2000,or both, Ralph informed Gary that he was changing his Will to bequeathHarold Todd $12,000. Gary also testified that during a conversation inMarch, Ralph informed Gary that he would not be able to serve as executorof Ralph's will because he lived out of state. These conversations showthat Ralph understood and intended to make a new will, or at least toamend his prior will.
 In the period between January 2000 until Ralph's death, Ralph twiceloaned Gary money. The first of those loans was for $700. The amount ofthe second loan is unclear, but it appears to be less than $700. (T.91). Ralph's ability to perform a loan transaction demonstrates that hewas lucid at the times those transactions were made. It also shows thatRalph must have appreciated Gary's relationship to him.
 Other than through two or three phone calls a month, Gary Worstell hada limited ability to observe Ralph's mental state. Gary Worstell was notpresent when Ralph executed his will and cannot testify as to Ralph'smental state at the time. At the very least, Gary Worstell's testimonyfails to show that Ralph Worstell did not satisfy any of the four Niemesfactors.
 Similarly, Robert Bentley's testimony sheds little light on RalphWorstell's capacity to execute his 2000 Will. Bentley, who was Ralph'stenant, testified that he visited Ralph twice before died. Bentleyvisited Ralph one month before Ralph died. Bentley testified that Ralphrecognized him and they had a brief conversation. (T. 106). Bentley alsovisited Ralph about a week before Ralph died. (T. 105). Bentley testifiedthat when he walked into Ralph's room, Ralph recognized him, put his armup and said "Robert," and then passed out. (T. 107, 109). Bentley'stestimony only establishes that both a month before his death and a weekbefore his death, Ralph was able to recognize Bentley. Both were afterthe 2000 will had been executed.
 Gary Worstell's case relied almost entirely on the opinion testimony ofDr. Albert N. Bayer. Dr. Bayer had no personal interaction with RalphWorstell; his opinion was based solely on his review of the medicaldocuments from the nursing home, hospital, and the hematologist who hadcared for Ralph Worstell. (T. 120). Dr. Bayer also testified that henever read the depositions of any of the individuals who had cared forRalph because he did not obtain them, though he did send a letter to thecontestant's attorneys requesting that they provide him thisinformation. Dr. Bayer also testified that he spoke to no one who hadcared for Ralph at the hospital or at the nursing home about the notesthey made in Ralph's medical records or their perceptions of Ralph'scondition. (T. 158-161).
 From his examination of the records he was provided, Dr. Bayer was ableto testify that, in addition to the incurable cancer from which hesuffered, Ralph was suffering from other serious illnesses during thelast several months of his life, during which time he executed thecontested will. Principal among these were dementia, related to hisadvanced age, as well as heart and pulmonary disorders. The combinedeffects of those and other illnesses and the medications administered totreat them produced a substantial impairment of Ralph's mentalfaculties, in Dr. Bayer's opinion. His ultimate opinions were stated asfollows:
 "Q. [B]ased on your review of the records and based upon your medical training, experience and based upon your understanding of the various medical conditions suffered by Ralph Worstell as well as the behaviors exuded by Ralph Worstell, do you have a conclusion to Ralph Worstell's mental condition as of March 16, 2000?
 "A. Yes. I would certainly say that he was experiencing a delirium at that time and that his ability to process information was substantially impaired.
 "Q. Do you have an opinion with respect to whether he was capable of knowing the nature and extent of his property?
 "A. I would say that it — that [it] certainly would be compromised, that it would not be intact.
 "Q. And with his ability to understand his relationship with family members?
 "A. I would say that it would not be intact, that [it] would be compromised to a substantial degree.
 "Q. And with respect to his ability to understand the business in which he was in, what would your opinion be with respect to that?
 "A. Again, I would say it would be compromised.
 "Q. Okay. And Dr. Bayer, also do you have an opinion with respect to whether Ralph Worstell had the capacity to execute a will on that date?
 "A. I would say conclusively that he did not have the capacity to execute a will on that date.
 "Q. Okay. Why is that?
 "A. Based on medical conditions that he had and the evidence of his behaviors and the references to different types of impaired cognitive functioning he had a delirium that would substantially impair his ability to understand and execute such a document.
 "Q. Was Ralph Worstell of sound mind when he executed this will?
 "A. No. (T. 151-152).
 This testimony addressed each of the requirements articulated inNiemes, showing that Ralph Worstell failed to satisfy the competencystandard required to execute a valid will. However, on re-cross, Dr.Bayer recanted this position when he conceded that it "was established inthe record" that Ralph Worstell knew he owned two farms, was able toconduct business, and that he knew he was changing his will. (T. 210).More specifically, Dr. Bayer testified that the record showed that Ralphknew who he was; that "it appeared to be true" that Ralph Worstellrecognized and understood the people who visited him; that he could notconclusively testify that Ralph Worstell did not understand the natureand extent of his property when he executed the 2000 Will; and that whenRalph Worstell met with his attorney to make the 2000 Will, "[RalphWorstell] certainly indicated that he understood he was involved in somesort of important meeting." (T. 210-211).
 Dr. Bayer conceded that the record he reviewed showed that RalphWorstell satisfied the functional components of the Niemes test.Nevertheless, Dr. Bayer still opined that Ralph Worstell lacked therequisite testamentary capacity to make a will. Dr. Bayer testified thatfrom December 1999, to his death in May of 2000, Ralph Worstell could nothave competently made any substantial decision-making regarding legalmatters or medical matters. (T.198).
 While evidence of a testator's mental and physical condition within areasonable time before and after the making of the will is admissible, tothrow light on his mental condition at the time of the execution of thewill in question, it is the mental condition of the testator at the timeof making a will that determines his testamentary capacity. Kennedy v.Walcutt, supra, paragraph 2 of the syllabus. Except by generalinference, Dr. Bayer's opinions do not support that specificproposition. Additionally, it is important to note that the Niemes testfor competency and the doctor's medical diagnosis of competency are notidentical concepts. "Testamentary capacity is a rational understanding ofthe kind and value of the property involved, the manner in which theproperty is intended to be disposed of, and the ability, withoutsuggestion, to make a testamentary disposition of the property." 31 OhioJurisprudence 3d, Decedents' Estates, Section 243. We agree with theAppellant that Dr. Bayer's opinion, founded on Ralph's medical condition,was not necessarily consistent with the legal definition of capacity inNiemes, and it may have misled the jury to disregard the applicable legalstandard.
 "Physical disability is not an impediment if it does not destroy thetraditional elements of testamentary capacity — the ability of theperson to understand the nature of the business in which engaged, tocomprehend generally the nature and extent of property owned, to hold inmind the names and the identity of those who have natural claims on theperson's bounty, and to be able to appreciate family relationships. So, aperson may have testamentary capacity even though of advanced years,suffering from disease. All that is necessary is that at the time of theexecution of the will the testator had sufficient mental capacity tounderstand what was being done, or, in general, possessed the elements oftestamentary capacity. . . .
 "However, weakness of intellect, sufficient to negate testamentarycapacity, may be traceable to old age, disease, and bodily infirmities,and the pain or effect of a disease may be such that one cannot be heldto have a sound and disposing mind and memory." 31 Ohio Jurisprudence3d, Decedents' Estates, Section 249 (illustration omitted).
 Dr. Bayer inferred that Ralph was incompetent by reason of the physicaldisabilities he identified from Ralph's records, as well as certaininappropriate behaviors in which he was reported to have engaged.However, those behaviors were explained by other witnesses, and were notso inappropriate under the circumstances shown as to connote a lack ofmental acuity.
 In that regard, emphasis was put on the fact that, while he was in thenursing home, Ralph voided his bladder and bowels into bowls or cans thatwere at his bed. But, it was explained that his illnesses had left himincontinent, and his conduct was to avoid soiling himself, and he stoppedafter being told to. This does not portray irrational or irresponsiblebehavior.
 Evidence shows that Ralph understood the nature of the business inwhich he was engaged, namely executing a will. There are several entriesin his medical records relating Ralph's stated desire to make a newwill, and also in the testimony of both those who cared for him in thenursing home and in the testimony of his friends who frequently visitedhim. (T.187-188). Hospital records show that on one specific occasion,the day before Ralph was scheduled to meet with Attorney Gilbert abouthis new will, Ralph told a nurse: "I'll be having a meeting in my roomtomorrow at 9:00 a.m. I would like to have my breakfast to be servedearly so that my room will be clean for the meeting." (T. 187). In fact,the hospital records of March 16, 2000, the day Ralph signed his will,show that at 9:00 a.m., the time of the scheduled meeting, that Ralph wasalert, that his appetite was good and that he was "pleasant andcooperative with caregivers." (T. 189).
 Gary Worstell testified that Ralph had mentioned to him during aconversation in January of 2000 that Ralph was planning to change hiswill. (T. 87-89). Harold Todd testified that Ralph told Todd that he hadtried several times to contact the lawyer who drafted his previouswills, but without success. (T. 380). When Ralph's calls wentunanswered, Ralph asked Todd to find him another lawyer. Todd searchedthe phonebook for an attorney and called Attorney Gilbert. Gilbertinformed Todd that Ralph needed to contact Gilbert himself. (T. 380).Ralph then did that, not once but twice; first to set up the preliminarymeeting, and again to follow up and set up a time to execute the will twoor three weeks later. (T. 355). Even Gary Worstell's expert witness, Dr.Bayer, admitted that Ralph knew he was changing his will. (T. 210).Finally, Deborah Hopper, a disinterested witness, testified that shewitnessed Ralph voluntarily sign the will, and she testified that heappeared well aware of his actions. Attorney Gilbert testified likewise.
 It is also obvious that Ralph was able to comprehend generally thenature and extent of his property. Attorney Gilbert, who drafted Ralph's2000 Will at his instruction, and Gary Worstell, both testified thatAttorney Gilbert was unaware of the terms of Ralph's previous will, andthat Attorney Gilbert never spoke to the previous attorney who haddrafted the 1995 Will until after the 2000 Will was executed. (T. 89-90,358). Nevertheless, the 1995 Will and the 2000 Will contain nearlyidentical provisions wherein Ralph leaves a life estate interest in hishouse and his 1990 Cadillac to Bonnie Phillips. Gary Worstell is alsobenefitted in both, though to a lesser extent in the 2000 will. Theconsistency of these provisions show: that Ralph understood and was ableto communicate what property he had and where he wanted his property togo as clearly in the 2000 Will as in the 1995 Will.
 Attorney Gilbert testified that when they met to discuss draftingRalph's will, Ralph told him that he owned two farms in New Lebanon, ahouse in New Lebanon, and a 1990 Cadillac. (T. 367). He testified thatRalph even gave him directions to the farms, and later asked Gilbert tohave them appraised in case he had to sell them. Gary Worstell testifiedthat he had several conversations with Ralph concerning Ralph'sproperty. In one conversation, in late January, Gary testified that Ralphtold him where different pieces of farming equipment could be found onthe farms, and was so detailed in his description that he informed Garyof specific parts that were missing from one of the plows. (T. 86).Finally, even Gary Worstell's expert witness, Dr. Bayer, conceded that hecould not conclusively state that Ralph did not know the extent and valueof his possessions. (T. 211).
 Harold Todd and his wife, Charlene Todd, and her mother, BonniePhillips, testified concerning their long friendship with Ralph and theassistance they provided during his last illness. They helped him managehis business affairs, always at his direction, which included collectinghis rents, having his taxes prepared, and assisting him in writingchecks. In all these enterprises, according to the witnesses, Ralph wasfully cognizant of his affairs and capable of making appropriatejudgments about them.
 It is also clear that Ralph held in his mind the names and identitiesof those who had natural claims upon his bounty, and that he appreciatedhis relation with members of his family. Attorney Gilbert testified thatRalph said that he had no immediate family and that his only real familywas his nephew, Gary Worstell, who lived in Atlanta. (T. 367). The 2000will bequeaths Gary Worstell $100,000 in cash and a remainder interest inRalph's home, which is valued at approximately $90,000. Ralphspecifically named Gary in the will and referred to him as his "nephew".This clearly shows that Ralph was well aware of those who had naturalclaims on his bounty. Ralph's devise of approximately $190,000 worth ofcash and property to Gary shows that Ralph appreciated thisrelationship, even while electing to leave the bulk of his estate to theAmerican Cancer Society. Harold Todd, who had survived cancer, said thatRalph mentioned the American Cancer Society to him and said: "Look whatthey're doing for people like us." (T. 393).
 The principal difference between Ralph's 1995 will and the will heexecuted in March of 2000 is in his bequest of the rest, residue, andremainder of his estate to the American Cancer Society instead of to GaryWorstell. Ralph was first diagnosed with cancer in 1999. Dr. Bayer'stestimony shows that Ralph was sorely tried by the illness and itstreatment. He may very well, and apparently did, wish to benefit anagency whose work could help others similarly afflicted. Ralphnevertheless made ample provision in the 2000 will for his only remainingfamily member, Gary Worstell, with whom he was not especially close, andwhom Ralph had no reason to expect would continue family ownership ofRalph's two farms should Ralph bequeath them to him.
 As we noted above, judgments supported by some competent, credibleevidence will not be reversed because it is against the manifest weightof the evidence. C.E. Morris Co. v. Foley Constr. Co, supra. Further, inSeasons Coal Co. v. City of Cleveland (1984), 10 Ohio St.3d 77, theSupreme Court stated:
 "While we agree with the proposition that in some instances an appellate court is duty-bound to exercise the limited prerogative of reversing a judgment as being against the manifest weight of the evidence in a proper case, it is also important that in doing so a court of appeals be guided by a presumption that the findings of the trier-of-fact were indeed correct." Id., at 74-80.
 Even when a judgment of a trial court is sustained by sufficientevidence, an appellate court "may nevertheless conclude that the judgmentis against the weight of the evidence." State v. Thompkins (1997),78 Ohio St.3d 380, 387. "The test is whether that evidence is capable ofinducing belief in its truth, and whether those truths preponderate infavor of the verdict according to the applicable burden of proof." Statev. Moshos, (Oct. 10, 1997), Greene App. No. 96CA140. In making thatdetermination, this court "will not arbitrarily substitute its judgmentfor that of the trier of fact on the issue of witness credibility . . .unless it is patently apparent that the factfinder lost its way." Id.
 After carefully reviewing all the evidence presented, we find that itdoes not preponderate in favor of the jury's verdict that Ralph Worstellwas not competent to make the will he executed on March 16, 2000, andthat in finding that he was incompetent the jury patently lost its way.Other than the testimony of Dr. Bayer, all the evidence demonstrates thatwhen he executed the will Ralph Worstell understood what he was doing,what property he owned, the identity of his natural heirs, and that heappreciated his relationship to them. Niemes.
 Whether a testator was competent to make a will is not subject todirect proof; competence must be proved inferentially from otherevidence. The foundational evidence on which Dr. Bayer relied for hisopinions consisted of entries made by other persons in nursing homerecords and his conclusions about the possible effects that RalphWorstell's illnesses and medications may have had on him. In making thesecritical judgments, Dr. Bayer lacked the benefit of any personalobservations of Ralph Worstell, which is significant to the conclusionshe drew. All the observations of the other witnesses whose testimonypreponderated in favor of competence concerned matters within their directand personal knowledge, and is deserving of greater weight wheninferences from it must be drawn to reach the requested verdict.
 In appellate review of the weight of the evidence, great deference isdue to the factfinder's decision as to which testimony to credit, sincethe factfinder has seen and heard the witnesses testify. In this case,there are no issues of credibility. After State v. Thompkins, supra, lessdeference is due to a factfinder's decision as to how much logical forceto assign an inference suggested by that evidence, or how persuasive itis, because appellate judges are at least equally qualified, by reasonand experience, to venture opinions concerning logical force of competinginferences. State v. Lawson (August 22, 1997), Montgomery App. No. 16288.
In the case before us, our weight of the evidence determination involves weighing inferences, not determining which witness was more credible, and we may give less deference to the factfinder when inferences are weighed. For all of the above reasons, we find that the verdict and judgment for Gary Worstell is not supported by competent and credible evidence that preponderates in favor of the necessary finding Ralph Worstell lacked testamentary capacity at the time he executed his will on March 13, 2000.
Appellant's second assignment of error is sustained. The judgment of the trial court will be reversed and the case will be remanded for a new trial.
WOLFF, P.J. and FAIN, J., concur.